J-S44032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1291 EDA 2023 |

Appeal from the Order Entered May 17, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000210-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1292 EDA 2023 |

Appeal from the Decree Entered April 24, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000502-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1293 EDA 2023 |

Appeal from the Order Entered May 17, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000211-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : : | |
| APPEAL OF: B.R., MOTHER | : : : : : : | |
| | : | No. 1294 EDA 2023 |

Appeal from the Decree Entered April 24, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000503-2022

BEFORE:   OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED APRIL 30, 2024**

B.R. ("Mother") appeals from the April 24, 2023 decrees entered in the Court of Common Pleas of Philadelphia County, Juvenile Division, involuntary terminating her parental rights to her two children, C.R. (born in 2014) and A.R. (born in 2018) (collectively, "Children").  Mother also appeals from May 17, 2023 orders that changed the permanent placement goal for Children from reunification to adoption.  After careful review, we affirm.

The Department of Human Services of the City of Philadelphia ("DHS") became involved with Children in 2019, upon receiving a general protective services report that Mother was homeless and providing inadequate care for Children.  N.T., 4/21/23, at 78.

On July 10, 2019, an order of protective custody was obtained for Children.  *Id.*  On August 29, 2019, the Community Umbrella Agency ("CUA")

_____

[*] Retired Senior Judge assigned to the Superior Court.

implemented an in-home services plan for Mother, providing her with assistance for Children and specifically items for A.R.'s care. *Id.* at 78-79. CUA recommended for Mother to complete parenting, domestic violence, and healthy relationships services; complete a budget plan and provide proof of income; ensure that Children attend medical, dental, and specialist appointments; ensure that Mother was following recommendations delivered at those appointments; ensure that Children were attending therapy and early intervention services; and ensure that C.R. was attending school. *Id.*

Following a hearing on February 21, 2020, Children were adjudicated dependent and removed from Mother's care and legal custody of Children was transferred to DHS. *Id.* at 79-80. Children have remained in foster care since that date. *Id.* at 80-81. While they were initially in separate homes due to C.R.'s required medical care, in the summer of 2022, A.R. was reunited with C.R. in the current, pre-adoptive foster home where C.R. has resided since February 2020. *Id.* at 89, 101, 121-22.

After a meeting on March 5, 2020, a single case plan was established requiring Mother to: attend appointments; participate in parenting services; participate in supervised visits; engage in mental health services; engage in intellectual disability services; maintain housing; complete a budgeting plan; and provide proof of income. *Id.* at 82. Mother's single case plan objectives have largely remained the same throughout the duration of the case, although additional requirements were added for Mother to complete a parenting capacity evaluation and attend family school. *Id.* at 84, 95-96. The

whereabouts of Children's father, P.S. ("Father"), was unknown at the date of the adjudicatory hearing, but he was later located and a single case plan was established for Father. *Id.* at 81, 86.

Permanency review hearings were held on September 9, 2020, October 30, 2020, June 28, 2021, October 25, 2021, May 10, 2022, and January 27, 2023. Mother was determined to have made minimal compliance toward alleviating the circumstances that necessitated the original placement of Children at each of these hearings, except at the October 25, 2021 hearing where she was found to have made moderate compliance with this objective.

On August 22, 2022, DHS filed petitions to involuntarily terminate Mother's parental rights to Children pursuant to Sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b), as well as petitions to change Children's permanent placement goals to adoption. DHS also filed petitions to terminate Father's parental rights to Children on that same date. On April 21, 2023, a hearing was held on the termination and goal change petitions.[1] At the hearing, CUA Case Management Director Jessica Estevez, CUA Case Manager Sandra France, and Mother testified.

---

[1] Children were represented in these proceedings by a guardian *ad litem* and separate legal interests counsel. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (appellate courts must engage in *sua sponte* review to determine if trial courts have appointed counsel to represent the legal interests of a child in a contested termination proceeding).

Estevez testified that she had been supervising the case since November 29, 2021, and she was responsible for managing the case file as the CUA Director. N.T., 4/21/23, at 77-78. Estevez stated that Mother had been minimally compliant with her single case plan objectives and had made minimal progress toward reunification with Children throughout the life of the case. *Id.* at 84. Regarding the objective for Mother to engage in mental health services, Estevez stated that Mother had never provided CUA with any documentation throughout the case despite frequent requests for treatment plans or progress reports. *Id.* at 83, 96. Estevez stated that CUA was made aware that Mother had been diagnosed with bipolar disorder and depression. *Id.* at 96. Estevez noted that Mother reported at the start of the case that she had previously been receiving mental health treatment at Tree of Life but had ceased attending. *Id.* at 96.

Mother was also referred for intellectual disability services. Estevez said that Mother did complete a psychological evaluation in March 2020, and it was estimated that she had an IQ of 50. *Id.* at 96-97. However, Mother never engaged in intellectual disability services and therefore was not compliant with this goal. *Id.* at 83, 96.

Estevez testified that Mother also has not completed the parenting capacity evaluation that was added to her single case plan in October 2020. *Id.* at 84. Mother missed her appointment for the evaluation and has remained on a wait list since. *Id.* at 97-98.

Estevez testified that Mother was referred for parenting, domestic violence, and budgeting programs and completed each of these. *Id.* at 82-84. However, Mother was discharged from family school for noncompliance and therefore she did not meet that objective. *Id.* at 98, 120-21. Mother initially did not attend any of Children's medical appointments as ordered but she has "attended a couple" of appointments during the case. *Id.* at 82, 102.

Regarding the requirement that Mother provide proof of income, Estevez stated that Mother was unemployed as of the date of the hearing. *Id.* at 100. Mother confirmed during her testimony that she relies on Supplemental Security Income. *Id.* at 63-64, 141, 146. Mother was also not compliant with the housing objective of her single case plan. *Id.* at 99. Estevez testified that Mother had been living with her paramour for almost the entire duration of the case, but Children had reported that the paramour had sexually abused them and that they witnessed instances of domestic violence between Mother and the paramour. *Id.* at 83, 94, 98-99. Therefore, Mother has been told throughout the life of the case that she would not be reunited with Children while she resided with the paramour. *Id.* at 83, 99. Estevez testified that CUA was informed that Mother moved out of the paramour's residence and into a rooming house the month prior to the hearing; however, CUA does not deem a rooming house to be an appropriate place for Children to reside. *Id.* at 83-84, 99-100.

Mother's final single case plan objective was to attend visitation with Children. Estevez testified that Mother has been generally consistent with

visitation during the case, which took place at CUA's offices. *Id.* at 85, 126. However, Mother has never progressed to unsupervised visitation due to concerns for her ability to act appropriately and keep Children safe. *Id.* at 100. Estevez stated that those concerns remain as of the date of the hearing. *Id.* Estevez did testify, however, that Mother and Children do generally behave appropriately with each other during the visits she had witnessed. *Id.* at 119. Estevez said that Mother does not provide any financial support for Children or send them letters or cards, but she has occasionally provided Children gifts during supervised visits. *Id.* at 86; *see also id.* at 146.

When asked about the parent-child bond, Estevez stated that, while Children enjoy their visits with Mother and identify Mother as their mom, they do not share a parent-child bond with her. *Id.* at 89, 103. Instead, Children view Mother as only a "visitation resource" and not a caregiver who can attend to their daily medical or emotional needs. *Id.* at 90, 104. Additionally, Children do not look to Mother for their care and comfort. *Id.* at 90. Estevez stated that it was in Children's best interests to terminate Mother's parental rights and that it would not cause Children irreparable harm to do so. *Id.* at 91-92.

Estevez testified that Children do share a parent-child bond in the pre-adoptive foster home where C.R. has resided since February 2020 and A.R. has resided for a little less than one year. *Id.* at 89-91, 101, 103, 121-22. Children have also developed a close relationship with the extended family of the foster parents. *Id.* at 103. Estevez stated that Children refer to their

foster parents as "mom" and "dad" and look to them for their care and comfort. *Id.* at 91, 127. Estevez testified that Children are happy in the foster home and, in particular, that A.R. has "really started to blossom" since being placed in that home. *Id.* at 105. The foster parents also provide safety and stability for Children and meet their daily emotional, medical, and therapeutic needs. *Id.* at 91, 105. These needs include trauma-focused therapy and intensive medical needs. *Id.* at 93, 108, 116-17. Children are up to date on their medical, dental, and vision appointments, and their educational needs are being met. *Id.* at 93, 103. Both Children have an individualized education program at their school and pre-kindergarten. *Id.* at 116-17. Estevez stated that C.R. wishes to be adopted by the foster parents while A.R. looks to the foster parents as her mother and father; Estevez additionally noted that foster parents have indicated their willingness to facilitate contact between Children and their biological parents after adoption. *Id.* at 104-05, 127, 133-34.

France, the CUA case manager, testified that she last visited with Children in the foster home on April 9, 2023. *Id.* at 135-36. France stated that Children are safe in the foster home, foster parents are meeting their medical, dental, and vision needs, and Children otherwise are receiving appropriate services. *Id.* at 136.

Mother testified that she is able to properly care for Children and meet their basic needs, including their educational and medical needs. *Id.* at 147, 149-50. Mother stated that she loves Children, she shares a parent-child bond

- 8 -

with them, they call her "mom," and that her wish was for reunification with them. *Id.* at 146, 149-50. Mother testified that she has never harmed Children and would be able to protect them; she stated that she "can be a good mom" and admitted that she "messed up because of [her] ex-boyfriend." *Id.* at 149.

Mother confirmed that she had been diagnosed with bipolar disorder and depression and that she had been prescribed medications to treat her conditions. *Id.* at 64, 141, 144-45. Consistent with the testimony of the CUA director, Mother stated that she is currently living in a rooming house. *Id.* at 60, 141-42. Mother's testimony was unclear as to when she moved out of the residence with her former paramour and into the boarding house, as she provided a range of dates from nine to three months before the hearing. *Id.* at 142-43 (stating that she moved into the rooming house in July 2022, August 2022, November 2022, and January 2023). When asked whether she intended to find a larger residence to allow her to better care for Children, Mother responded that she did not. *Id.* at 148.

At the conclusion of the hearing, Children's legal interests counsel indicated that Children were very happy in the foster home and bonded with foster parents. *Id.* at 162. Counsel indicated that, while Children do not understand the concept of adoption, they do understand the concept of a forever home and they wished for the foster home to be their forever home. *Id.*

On April 24, 2023, the trial court entered decrees terminating Mother's parental rights.[2] On May 17, 2023, the trial court entered orders changing Children's placement goals to adoption. Mother filed timely notices of appeal from the decrees and orders and concurrently filed concise statements of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i). These appeals were then consolidated *sua sponte* by this Court.

Mother raises two issues on appeal:

[1]. Was the trial court's decision to involuntarily terminate [Mother's] parental rights to [C]hildren [] supported by clear and convincing evidence presented at trial?

[2]. Was the trial court's decision to change [Children's] permanency goals from reunification with the parent(s) to adoption supported by clear and convincing evidence presented at trial; and is that disposition in [C]hildren's best interests?

Mother's Brief at 7 (suggested answers omitted; reordered for ease of disposition).

In her first issue, Mother challenges the decrees terminating her parental rights to Children. We begin our analysis with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

---

[2] The trial court also terminated Father's parental rights. He appealed from those decrees, which this Court affirmed in a separate decision. ***See In the Interest of C.R.***, Nos. 1287-1290 EDA 2023 (Pa. Super, filed Nov. 1, 2023) (unpublished memorandum).

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.]" *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1)-(11). If the trial court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. *T.S.M.*, 71 A.3d at 267.

Here, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8), and subsection (b). However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \*         \*         \*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> \*         \*         \*

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

Under Section 2511(a)(2), "the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal

caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Adoption of L.A.K.***, 265 A.3d 580, 600 (Pa. 2021).

> [S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being.  Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect.  This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

***In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted).

The grounds for termination under Section 2511(a)(2) are not limited to affirmative misconduct, but also include refusal and parental incapacity that cannot be remedied.  ***Id.***; ***In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021).  "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." ***A.H.***, 247 A.3d at 443; ***see also In re Adoption of K.M.G.***, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*), ***affirmed***, 240 A.3d 1218 (Pa. 2020) (noting that a parent has an "affirmative duty" to work towards the return of her children, which requires, at a minimum, that she "cooperate with the Child and Youth Agencies and complete the rehabilitative services necessary so that the parent can perform [her] parental duties and responsibilities").  "A parent's vow to cooperate,

after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **Z.P.**, 994 A.2d at 1118 (citation omitted). "[W]hen a parent has demonstrated a continued inability to conduct [her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." **Id.** (citation omitted).

Once a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), the court turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." **T.S.M.**, 71 A.3d at 267 (citation and quotation marks omitted); **see also In the Interest of K.T.**, 296 A.3d 1085, 1106 (Pa. 2023). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." **K.T.**, 296 A.3d at 1105.

Our Supreme Court has consistently mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child." **T.S.M.**, 71 A.3d at 267 (citing **In re E.M.**, 620 A.2d 481 (Pa. 1993)). Specifically, "[c]ourts must determine whether the trauma caused by

breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a permanent home." *Id*. at 253 (cleaned up). The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," causing the child to suffer "'extreme emotional consequences' or significant, irreparable harm." *K.T.*, 296 A.3d at 1109-10 (quoting *E.M.*, 620 A.2d at 484). "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *A.H.*, 247 A.3d at 445 (citation omitted). "Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *Id.* (citation omitted).

"[A] court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *K.T.*, 296 A.3d at 1113. Our Supreme Court has explained that the court should consider, as appropriate, the child's need for permanency and length of time in foster care, the child's placement in a pre-adoptive home and whether there is a bond with the foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs. *Id.* Nonetheless, there is no "exhaustive list" of factors that must be considered by a trial court in this context. *Id.* at 1113 n.28.

Mother argues that DHS did not meet its burden of proof of clear and convincing evidence for termination of her parental rights pursuant to Section 2511(a)(2) as a result of the inadequate and contradictory testimony by the CUA representatives at the April 21, 2023 hearing revealing that "the efforts

of [CUA] have left much to be desired." Mother's Brief at 16. In particular, Mother contends that Sandra France, the CUA Case Manager, showed little knowledge of the history of the case and the court-ordered referrals, and exposed her belief that CUA was not required to provide reunification services for Mother. Mother avers that France's testimony was "evidence of an ambiguous and expressly uncertain nature, not 'clear and convincing.'" *Id.* at 18. Mother asserts that the testimony of Jessica Estevez, the CUA Case Management Director, did not serve to rehabilitate the earlier testimony by France as it "at times appears to contradict her case manager" and "at others provided only the barest details of the current management of the case, and minimal first-hand knowledge overall." *Id.*

The trial court reasoned that termination was appropriate pursuant to Section 2511(a)(2) as follows:

> Applying [Section] 2511(a)(2), it is clear that DHS met its burden of demonstrating that termination of Mother's parental rights . . . was proper. The Children were brought into care in February 2020 based on concerns regarding Mother's mental health and intellectual disability, parenting capacity, housing, and ability to provide the Children with proper parental care and control. Mother's incapacity under [Section] 2511(a)(2) exists in that Mother failed to demonstrate a concrete desire or ability to remedy the conditions that led to the Children's placement. Mother failed to comply with the recommendations from her [psychological] evaluation and has not engaged in mental health treatment or [intellectual disability services] nor has she provided CUA with documentation of being engaged in such treatment. Mother's [psychological] evaluation also showed that Mother had an IQ of approximately 50. Thus, Mother was also ordered to complete a [parenting capacity evaluation]. However, Mother failed to complete this objective despite a referral being made. Mother's mental health and parenting capacity were the primary

dependency concerns preventing reunification with Mother. She also only attended a few of the Children's medical appointments to obtain a better understanding of their complex medical and therapeutic needs. For the majority of the case, Mother resided with her paramour, an inappropriate caregiver, despite being told numerous times that she could not be reunified with the Children while living in that home. While Mother recently moved out of that home and to a rooming house, Ms. Estevez testified that this was not appropriate for reunification. Additionally, Mother's visits with the Children never progressed beyond supervised weekly at the CUA agency due to concerns for Mother's ability to keep the Children safe. Mother completed [a] parenting [program] but was discharged from Family School in 2022 due to noncompliance.

Th[e trial c]ourt found that Mother's failure to fully or substantially comply with her [single case plan] objectives left the Children without the essential parental care, control, and subsistence necessary for their physical or mental well-being, and the cause of such neglect, refusal, and continued incapacity would not be remedied by Mother. The Children have been in DHS care since February 2020. They have spent over three years outside the care and control of Mother. Mother's compliance with her [single case plan] objectives was moderate to minimal throughout the case, and there has not been sufficient progress made to reunify the Children with Mother. For these reasons, [there was] clear and convincing evidence existed to justify the involuntary of Mother's parental rights pursuant to [Section] 2511(a)(2).

Trial Court Opinion, 6/9/23, at 14-15.

Upon review, we conclude that the trial court did not err or abuse its discretion in ruling that termination is appropriate under Section 2511(a)(2) and that the court's determination is well-supported by the record. The record reflects that Mother did not remedy her parental incapacity, which was primarily based on her mental health and intellectual disability issues, as well as the unsuitable housing that Mother maintained with her former paramour. While Mother was diagnosed with bipolar disorder and depression and claimed that she had been prescribed medication for these conditions at the hearing,

she never provided proof to CUA that she was engaged in mental health services that were required of her in her single case plan during the greater than three-year duration of the case. N.T., 4/21/23, at 81-83, 96. Mother also failed to participate in the mandated intellectual disability services. *Id.* at 82-83, 96-97. In addition, although Mother had moved out of unsuitable housing with her former paramour shortly before the hearing, she only moved into a rooming house and indicated that she had no intention of finding housing that would be appropriate for Children. *Id.* at 60, 83-84, 94, 98-100, 141-43. Mother also did not fulfill various other case plan objectives, including her failure to complete a parenting capacity evaluation and a family school course, and her visitation never progressed past supervised visits with Children based upon concerns that Mother could not keep Children safe. *Id.* at 84, 96-98, 120-21.

Furthermore, Mother's arguments with respect to the trial court's Section 2511(a)(2) ruling lack any merit. The allegedly inadequate testimony by CUA Case Manager France that Mother focuses on in her brief was not taken during Children's April 21, 2023 termination and goal change hearing but rather during the permanency review hearing for Children's older sister, B.R., that occurred earlier during the April 21, 2023 proceeding. *Id.* at 11-76.[3]

---

[3] B.R., who was 13 years old as of the date of the hearing and living in a group home, had expressed that she did not wish to be adopted, and B.R.'s potential placement with her maternal grandmother or aunt was explored during the hearing. N.T., 4/21/23, at 7, 11-76. We note that, while Mother's testimony
*(Footnote Continued Next Page)*

Although recorded in the same transcript as the hearing for this matter, France's testimony that occurred in a separate case not involving Children is not relevant to this appeal.[4] While France did also briefly testify at Children's termination and goal change hearing, that testimony was limited to her personal observations of Children during an April 9, 2023 foster home visit, and Mother has not raised any alleged deficiency with respect to this testimony by France. *Id.* at 135-36.

Moreover, Mother's claim that CUA Case Management Director Estevez lacked first-hand familiarity with the case is belied by the record. Estevez exhibited an intimate knowledge of the case, testifying that she had begun overseeing the matter in November 2021, was responsible for managing Children's case file since that date, personally completed several of Mother's referrals, and had personally observed Mother's interactions with Children during several dozen supervised visits at CUA's offices, including as recently as one month prior to the hearing.[5] *Id.* at 77-78, 118-20, 131-32. Finally, the sole contradiction Mother pointed to between Estevez's and France's

---

from B.R.'s permanency review hearing was incorporated into the later hearing involving Children, *id.* at 141, France's testimony was not.

[4] France indicated during the permanency review hearing that she had only begun working with Mother and her children in January 2023. N.T., 4/21/23, at 28-29.

[5] Notably, in arguing that Estevez lacks first-hand knowledge of the case, Mother cites only to Estevez's testimony concerning her lack of personal interactions with **Father**, not Mother. *See* Mother's Brief at 18 (citing N.T., 4/21/23, at 106, 114).

testimony relates only to the day of the week Mother visited with Children occurred, any dispute as to which does not call into question the lower court's ruling. Mother's Brief at 18 (citing N.T., 4/21/23, at 35, 84).

We next turn to the trial court's finding that termination of Mother's parental rights to Children best served their developmental, physical, and emotional needs and welfare under Section 2511(b). Mother argues that Estevez's testimony concerning Children's needs and welfare consisted of "rote recitations" in response to leading questions "following a DHS script." Mother's Brief at 19. Mother claims that Estevez's testimony lacked "detailed and child-specific information necessary for the trial court to make an appropriate assessment about whether termination would best serve the specific needs and welfare of either C.R. or of A.R." *Id.* Mother further contends that, notwithstanding the representations of Children's legal interests counsel that Children expressed a desire to make the foster residence their "forever home," N.T., 4/21/23, at 162, counsel did not indicate that she explored the option of a permanent legal custody ("PLC") arrangement to guarantee that Children would have continued visitation with their older sister and Mother. Mother argues that "an inquiry should have been made by the [trial] court to determine the best extent possible what [Children's] wishes are." Mother's Brief at 20.

The trial court addressed Children's needs and welfare as follows:

> Based on the evidence [presented at the termination hearing], th[e trial c]ourt determined that the Children would not suffer any irreparable harm if Mother's parental rights were terminated.

They have been in DHS care since they were adjudicated dependent in February 2020. C.R. has resided with the foster parents since her adjudication and A.R. was place[d] in the same home in August 2022. The Children are eight and five years old and have spent over three years outside of the care and control of Mother. There was compelling testimony presented at the [termination] hearing that while the Children know that B.R. is their biological mother, they do not share a parent-child bond with her. The testimony also reflects that the Children enjoy their visits with Mother, but they view her as a visitation resource as opposed to a caregiver. Furthermore, Mother's visits with the Children continue to be supervised and have never progressed to unsupervised throughout the case due to concerns that Mother is unable to keep them safe.

In determining the best interest of the child, th[e c]ourt must consider both the needs and welfare of the child such as love, support, care, and comfort. The Children do not look to Mother to meet these needs. Instead, the Children look to the foster parents to meet these needs. They also look to the resource parent to meet their basic needs as well as for safety and stability. The foster parents, not Mother, have attended to the Children's complex medical and therapeutic needs throughout the case. Mother only attended a few medical appointments for the Children throughout the case. Ms. Estevez testified that the Children have developed a close relationship with the foster parents and share a parent-child bond with them. She testified that the Children refer to the foster parents as "mom" and "dad." They are doing excellent in the home and are well-adjusted in this pre-adoptive placement. [Legal interests c]ounsel for the Children as well as Ms. Estevez stated that the Children wish to be adopted by the current resource parent who has been their most consistent caregiver for the last three years. For these reasons, Ms. Estevez testified that [the] goal best suited to meet the Children's developmental, physical, and emotional needs and welfare was adoption.

Clear and convincing evidence has been presented to establish that there would be no irreparable harm caused to the Children if this Court terminated Mother's parental rights. The Children deserve permanency and should not wait indefinitely. For these reasons, . . . it would be in the best interests of the Children to grant DHS's petition to terminate the parental rights of Mother pursuant to [Section] 2511(b) . . .

Trial Court Opinion, 6/9/23, at 19-20.

The trial court's findings and conclusions have ample support in the record. The trial court determined that, while Children know who Mother is and enjoy their visits with her, they do not share a parent-child bond with her; instead, the court found that they view Mother as a "visitation resource." *Id.* at 20. This testimony was supported by Estevez's testimony to that effect based upon her personal interactions with Mother and knowledge of the history of the case. N.T., 4/21/23, at 89-90, 103-04; *see also Z.P.*, 994 A.2d at 1121 (formal bonding evaluation is not required under Section 2511(b) and court may rely on testimony of caseworkers as to parent-child bond). Furthermore, additional circumstances support the finding that Mother lacked a parent-child bond with Children and instead looked to her as only a "visitation resource," including the greater than three years since Children's removal from Mother care and the fact that visits with Mother never proceeded past supervised visits at CUA's offices. N.T., 4/21/23, at 79-81, 100.

Moreover, the trial court appropriately considered that foster parents are currently satisfying Children's daily needs, not Mother. *Id.* at 90-91; *see also K.T.*, 296 A.3d at 1113. As the court noted, the foster parents provide safety and stability for Children, attend to their complex medical and therapeutic needs, and ensure that their educational needs are being met. N.T., 4/21/23, at 91, 93, 103, 108, 116-17, 136. Furthermore, Children are happy in the foster home, have developed bonds with foster parents, refer to

them as "mom" and "dad," and have a close relationship with their extended family. *Id.* at 91, 103, 105, 127, 162.

Mother faults the trial court's reliance on legal interest counsel's representations to the court regarding Children's preference to remain with foster parents and the absence of an inquiry by counsel into PLC as an alternative to adoption. Our Supreme Court has recognized that establishing a child's preference in a contested termination proceeding is a "fact-intensive and nuanced process," involving children at various "ages, maturity levels, and emotional capacity that all factor into a child's ability to express a preference." *In re P.G.F.*, 247 A.3d 955, 966 (Pa. 2021); *see also id. at* 967-68 (five- and six-year-old children were incapable of expressing a preference for adoption under the unique facts of the applicable cases); *In re T.S.*, 192 A.3d 1080, 1083 & n.17 (Pa. 2018) (children as young as five and eight are capable of articulating a preference in custody and termination of parental rights matters); *In re K.R.*, 200 A.3d 969, 985 (Pa. Super. 2018) (*en banc*) (children aged five and ten years old were able to express their preference in termination of parental rights proceeding). Recognizing that that the inquiry is "no simple task," the Court held a trial court must accord "significant deference . . . to counsel's approach in discerning a child's preferences and the child's articulations thereof." *P.G.F.*, 247 A.3d at 966.

The record shows that legal interests counsel undertook the necessary nuanced analysis to ascertain Children's preferences, testifying that she had met with Children and discussed their relationship with foster parents, noting

specifically that C.R. is eight-years old but presented as younger than her age and does not understand the concept of adoption. N.T., 4/21/23, at 162. Counsel then stated that Children did understand the concept of a "forever home," however, and that they "both definitely want [the foster home] to be their forever home." *Id.* The trial court relied on Children's preferences as stated to their counsel, as well as C.R.'s representation to Estevez regarding her preference to remain with foster parents, but the court acknowledged the limitation on Children's ability to understand the legal effect of the termination proceedings and did not place undue weight on Children's preferences, only citing it as one of many factors in support of its Section 2511(b) ruling. Trial Court Opinion, 6/9/23, at 8-9, 20. We discern no abuse of discretion by the trial court in affording "significant deference" to counsel's advocacy on Children's behalf. *P.G.F.*, 247 A.3d at 966. Furthermore, while legal interests counsel did not discuss PLC with Children, our Supreme Court in *K.T.* recognized that PLC is an appropriate permanency goal only "when neither reunification nor adoption is best suited for the child." 296 A.3d at 1116 n.33 (citing 42 Pa.C.S. § 6351(f.1)(3)); *accord In the Interest of K.C.*, 310 A.3d 296, 304 (Pa. Super. 2023). Here, there was ample evidence to support a finding that adoption was in Children's best interests and thus there was no basis for legal interests counsel to explore PLC with Children or advocate for such an arrangement at the April 21, 2023 hearing.

We further find Mother's remaining arguments with respect to Section 2511(b) lack merit. Mother contends that the direct examination of CUA Case

Management Director Estevez was leading and followed a "DHS script." Mother's Brief at 19. However, Mother did not object at any point to the alleged leading questioning of Estevez by DHS counsel and therefore any challenge on this basis is waived. *See In the Interest of L.V.*, 209 A.3d 399, 418 (Pa. Super. 2019). Additionally, Mother's argument that Estevez's testimony was nothing more than "rote recitations" of the Section 2511(b) standard that could not support termination of her parental rights, Mother's Brief at 19, is merely a request that we supplant the trial court's role as arbiter of facts and witness credibility and reweigh the evidence in her favor. *See K.T.*, 296 A.3d at 1117 (appellate courts "should defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness" and may not "reweigh the evidence and the credibility determinations of the trial court" on a cold record) (citation omitted). Accordingly, as Mother has shown no reason for this Court to overturn the trial court's conclusions under Section 2511(a)(2) and (b), Mother is entitled to no relief on her first appellate issue.

In Mother's second and final issue, she challenges the change of Children's permanent placement goals from reunification to adoption. Given our decision to affirm the trial court's termination decrees, any challenge to the goal change orders is moot. *See A.H.*, 247 A.3d at 446 ("[T]he effect of our decision to affirm the [trial] court's termination decree necessarily renders moot the dependency court's decision to change [a] [c]hild's goal to adoption."); *see also In the Interest of A.R.*, __ A.3d __, __, 2023 PA

- 25 -

Super 243, slip op. at 17 (Pa. Super. Nov. 28, 2023); *In the Interest of A.M.*, 256 A.3d 1263, 1272 (Pa. Super. 2021). We accordingly also affirm the trial court's goal change orders. *A.R.*, ___ A.3d at ___, 2023 PA Super 243, slip op. at 17; *A.M.*, 256 A.3d at 1272-73.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/30/2024